IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT J. WAREHAM,               )
                                 )
        Plaintiff,               )
                                 )        Civil Action No.  11-326
            v.                   )
                                 )        Chief Magistrate Judge Lisa Pupo
DOLLAR BANK,                     )        Lenihan
                                 )
        Defendant.               )        ECF No. 30
                                 )

## OPINION

LENIHAN, M.J.

        Currently before the Court for disposition is Defendant's Motion for Summary Judgment

pursuant to FED.R.CIV.P. 56 and Western District of Pennsylvania Local Rule 56.1 (ECF No.

30).   In this employment discrimination case, Plaintiff, Robert J. Wareham, asserts he was

terminated by his former employer, Dollar Bank, based on his age, in violation of the Age

Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* ("ADEA")*,* and based on the

expression of his religious beliefs in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §2000e-5 *et seq.,* ("Title VII").   In his Brief in Opposition to Defendant's

Motion for Summary Judgment ("Pl.'s Br. in Opp'n"), Wareham now consents to the dismissal

of his remaining common law claim for defamation in Count IV of the Complaint, and concedes

that his discrimination claims under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.

Cons. Stat. §951 *et seq.* in Count III are untimely. [1]   Pl.'s Br. in Opp'n at 1 n. 1 (ECF No. 40).

---

[1]Wareham's claims for defamation in Count V and interference with contractual relationships in
Count VI were previously dismissed with prejudice pursuant to Rule 41(a)(1) by joint stipulation
of the parties on 2/22/12, *see* ECF No. 28, and this Court's text order dated 3/7/12.

This Court has subject matter jurisdiction over Plaintiff's remaining federal law claims pursuant to 28 U.S.C. §1331.

Dollar Bank moves for summary judgment in its favor on Plaintiff's age and religion based discrimination claims, arguing that Wareham has failed to establish a prima facie case of discrimination based on religion.   In addition, Dollar Bank argues that Wareham has failed to prove that Dollar Bank's articulated legitimate, non-discriminatory reasons for terminating him were a pretext for age discrimination and that age was the "but-for" cause of his termination.

## I.    RELEVANT FACTS[2]

Founded in 1855, Dollar Bank is a regional financial services organization which serves individual and business customers throughout Western Pennsylvania and Northeastern Ohio with more than 50 offices and loan centers throughout the Pittsburgh and Cleveland metropolitan areas. (McQuade Aff. 2, Def.'s App. Tab A, ECF No. 33-1.) As a savings association, Dollar Bank is required to comply with federal banking regulations and certain guidelines promulgated thereunder,[3] which address standards for developing and implementing safeguards from an administrative, technical, and physical standpoint to protect the security, confidentiality, and integrity of customer information.[4]   (McQuade Aff. ¶¶ 3-4.) These Guidelines also address

---

[2]The facts will be viewed in a light most favorable to Plaintiff, and to the extent that any of the facts are disputed, the Court will note such dispute. At the outset, the Court notes that Wareham has not filed a direct response to Defendant's Concise Statement of Material Facts ("Def.'s CSMF") specifically admitting or denying each of Defendant's statements as required by Local Civil Rule 56C.1.  Thus, pursuant to Local Civil Rule 56E, for purposes of summary judgment, Defendant's CSMF are deemed admitted unless controverted by Plaintiff's separate concise statement.

[3] The guidelines referred to are the Interagency Guidelines Establishing Information Security Standards (" Guidelines") set forth in appendix B to part 570 of the federal banking regulations. The Guidelines set forth standards pursuant to section 39(a) of the Federal Deposit Insurance Act, 12 U.S.C. § 1831p-1, and sections 501 and 505(b) of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 and 6805(b).  (McQuade Aff. ¶ 3.)

[4] Protected customer information means any record containing nonpublic personal information

standards with respect to Dollar Bank's proper disposal of consumer information.[5]  (McQuade Aff. ¶4.)  In addition, the Guidelines also require Dollar Bank to implement a comprehensive written information security program that includes administrative, technical, and physical safeguards appropriate to its size and complexity and the nature and scope of its activities. (McQuade Aff. ¶5.) Dollar Bank must also exercise appropriate due diligence when selecting its service providers. (McQuade Aff.¶6.)

Part 573 of the federal banking regulations sets forth privacy notice requirements including requirements for Dollar Bank to disclose nonpublic personal information about a consumer to a non--affiliated third-party. (McQuade Aff.¶7.)  Dollar Bank chose not to send declined consumer loans to non--affiliated third parties as the easiest and most comprehensive way to ensure the protection of nonpublic consumer information.  (McQuade Aff. ¶8.) Large finance companies have offered to pay Dollar Bank for its declined consumer loan applications but Dollar Bank has declined those offers. (McQuade Aff. ¶9; Park Aff. ¶9, Def.'s App. Tab B, ECF No. 33-2.)

Wareham was hired by Dollar Bank in March 1994 as a Senior Loan Representative (Pl.'s Dep. At 12 – 13 & Ex. 2 thereto, Def.'s Tab C, ECF No. 33 – 3), and was promoted to Assistant Vice-President, Loan Centers, effective December 1, 1999 (O'Rorke Aff.¶3, Def.'s Tab D, ECF No. 33 – 4).  James McQuade, Senior Vice-President, began supervising Wareham in 2003. (McQuade Dep. at 10, 44, Def.'s Tab E, ECF No. 33 – 5.)  McQuade completed Wareham's performance evaluations for 2006 through 2008, and rated his overall performance as

---

about a customer, whether in paper, electronic, or other form, that Dollar Bank maintains or that is maintained on its behalf.  (McQuade Aff. ¶4.)

[5]The proper disposal of consumer information is mandated pursuant to sections 621 and 628 of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681s and 1681w.  (McQuade Aff. ¶4.)

exceeds expectations in each of those years. (Exs. 14, 15 & 16 to Pl.'s Dep., Def.'s Tab C, ECF No. 33-3 at 46 – 56.)  In the performance evaluation completed on 1/5/07, McQuade recommended that Wareham be promoted to Vice-President, Loan Centers, effective January 2007. (Ex. 14 to  Pl.'s Dep., ECF No. 33 – 3 at 46 – 47.)  McQuade made the decision to retain Wareham since 2003 and gave him annual salary increases during that time, except for 2004 when McQuade's supervisor rejected his recommendation to increase Wareham's salary. (McQuade Dep. at 47 – 48, Def.'s App. Tab E, ECF No. 33 – 5; Small-Carroll Dep. at 49 – 51, Def.'s App. Tab F, ECF No. 33 – 6.)

Beginning in approximately 1996 and continuing until his termination in December of 2009, Wareham developed a cross-referral relationship with Dave Alt, a licensed mortgage broker and partner with Three Rivers Mortgage Services Co.  (Pl.'s Dep. at 45, Pl.'s App. Tab 2, ECF No. 39-3; Alt Dep. at 10-11, 16-17, Def.'s App. Tab M, ECF No. 33-13 & Pl.'s App. Tab 6, ECF No. 39-7.)  Alt's business included, *inter alia,* servicing customers with credit histories that were not acceptable to Dollar Bank—customers with "B, C, and D" credit.  (Alt Dep. at 9, 81, Pl.'s App. Tab 6; Pl.'s Dep. at 45-47, Pl.'s App. Tab 2.)  Wareham introduced Alt to loan center employees in Pittsburgh and Cleveland and asked them to refer their declined loans to Alt. Wareham maintains that he instructed the loan center employees that they should only refer declined loan customers to Alt if the customer requested it and authorized the release of their personal information.   Customer authorizations were obtained verbally and usually communicated to Alt via telephone.

Wareham did not provide loan center employees with any instructions, nor did he implement any procedures, on how to refer the declined loans to Alt.  In addition, there was no written agreement between Alt/Three Rivers Mortgage and Dollar Bank governing the referral

relationship established by Wareham and Alt, no background check performed on Three Rivers Mortgage or Alt, and no written authorizations obtained from customers prior to releasing their personal information to Alt.

While employed at Dollar Bank, Wareham prepared monthly memoranda which set forth, *inter alia,* his marketing efforts and efforts to develop referral relationships in order to generate loan business.  (Pl.'s Dep. at 76-79; McQuade Dep. at 54-55.)  In these memoranda, Wareham mentions a referral relationship with Alt, but all of the references are general in nature.  For example, the memos mention meetings with Alt and a third party to generate a new source of loan referrals *to Dollar Bank*, occasions where Wareham took Alt to Dollar Bank loan centers where he met with loan center employees, and occasions where Alt invited Wareham to attend golf outings and sporting events.  *See* Wareham Memos dated 4/30/07, 10/20/07, 11/14/07, 12/17/07, and 1/10/08 (Pl.'s App. Tab 5, ECF No. 39-6).  In one such memorandum, Wareham describes Alt as the bank's "most consistent source of referral business.  He is able to get deals done that we can not.  He cleans them up and sends them back."  Wareham Memo dated 1/10/08 (Pl.'s App. Tab 5, ECF No. 39-6 at 14.)  Wareham initially sent these memoranda to Ed Brown,[6]

---

[6] In a memo to Ed Brown on 8/8/03, Wareham described Alt as a:

> terrific asset to us over the years.  He has been a conduit for us to send non Dollar Bank customers to when we can not get them financing for whatever reason.  Dave cleans up their ratios or credit and refers them back to us when they qualify as bank paper.  Dave and Three Rivers has been responsible for helping people achieve their initial goals and facilitating change that will help us in the long run."

Wareham Memo dated 8/8/03 (Pl.'s App. Tab 5, ECF No. 39-6 at 3).  However, this memo is not material, as Ed Brown was not involved in any way in the decision to terminate Wareham, as he left the bank in August of 2005.  (Smith-Carroll Dep. at 36.)  Also, Wareham has not presented any evidence to suggest that McQuade was aware of this memo to Ed Brown or its contents.  Likewise, it is immaterial that Abe Nader, a senior vice president of Dollar Bank who was unable to qualify for a loan through Dollar Bank, was referred to Alt by Wareham at the request of Ed Brown.

his direct supervisor for a couple of years, and then to McQuade after he took over as Wareham's direct supervisor in 2003.  (Pl.'s Dep. at 20-21, Pl.'s App. Tab 2, ECF No. 39-3; Wareham Memos, Pl.'s App. Tab 5.)

Wareham also met monthly with the Loan Center Committee ("LCC"), which was comprised of vice-presidents from various departments plus his direct supervisor, although McQuade did not regularly attend the LCC meetings.  (Smith Dep. at 11-13, Def.'s App. Tab J, ECF No. 33-10.)   At these meetings, Wareham made a report on loan center operations and advised the LCC of his marketing and business development efforts.  (Pl.'s Aff. ¶¶11-12; Smith Dep. at 11-13.)   One of the members of the LCC was Joseph Smith, Senior Vice President of Marketing for Dollar Bank.  (Smith Dep. at 5.)  Smith did not supervise Wareham in any way.  (Smith Dep. at 7.)[7]  The loan center staff and Wareham had no direct report relationship with marketing, which was in a separate division.  (Smith Dep. at 7-8, 10.)  However, Wareham had regular communications with Smith regarding loan center marketing budgets as it related to his marketing spending.  (Smith Dep. at 8-11, Def.'s Supp. App. Tab F, ECF No. 43 at 29-32.)

Wareham regularly wore a cross lapel pin throughout the duration of his employment. (Wareham Dep. at 171.)  In addition to regularly wearing a cross lapel pin, Wareham routinely expressed his deeply held religious beliefs based upon his Christian faith to McQuade and Smith. (McQuade Dep. at 109, Def.'s Supp. App. Tab B, ECF No. 43 at 15; Smith Dep. at 26; Wareham Decl. ¶21, Pl.'s App. Tab 9, ECF No. 39-10.)

---

[7] Wareham contends that Smith played a role in the decision to terminate him, but when asked what the basis was for this contention, he replied that Smith and McQuade were contemporaries. (Pl.'s Dep. at 162, Def.'s Supp. App. Tab A, ECF No. 43 at 5.)  This is insufficient to create a material issue of fact, especially in light of Dollar Bank's substantial evidence showing that Smith was not involved in the decision to terminate Wareham.  (Smith Dep. at 7-8, 32; Smith-Carroll Dep. at14, 23; McQuade Dep. at 134.)

In 2001, Dollar Bank issued lapel pins ("DB lapel pins") to corporate banking and private banking as part of an advertising campaign. (Smith Dep. at 24 & 27, Pl.'s App. Tab 4, ECF No. 39-5.) Sometime after that, Wareham came to Smith on several occasions and asked that the DB lapel pins be given to loan center personnel, and Smith complied. (Smith Dep. at 24-25.) On five or six occasions after the DB lapel pins were issued in 2001, Smith noticed that Wareham was wearing a cross lapel pin instead of the DB lapel pin, and asked why he was not wearing the DB lapel pin. (Smith Dep. at 25, 28.) On each occasion, Smith told Wareham that it was inappropriate for him to wear a religious cross lapel pin because when he is working, "he's representing the bank, so [the lapel pin] should be bank presentation, not the presentation of something else." (Smith Dep. at 25.)

The last time Wareham specifically recalls discussing his wearing a cross lapel pin with Smith was on January 15, 2008. (Wareham Dep. at 161.) At that meeting, Wareham contends that Smith told him he did not approve of his wearing a cross lapel pin and asked him not to wear it because it was a divisive symbol that sent the wrong message to Dollar Bank customers and vendors. (*Id.*) Smith claims he never used the word "divisive," but instead referred to Wareham's wearing the cross lapel pin as "inappropriate."[8] (Smith Dep. at 26, Pl.'s App. Tab 4.)

Wareham admits, however, that McQuade, who made the decision to terminate him, never told him not to wear his cross lapel pin. (Wareham Dep. at 174.) Moreover, McQuade did not tell Wareham that wearing the cross lapel pin could be seen as offensive to others who might not share his religious beliefs. (McQuade Dep. at 134.) McQuade never talked to Smith about Wareham's wearing of the cross lapel pin, and does not recall Wareham ever telling him that Smith criticized him for wearing the cross lapel pin. (McQuade Dep. at 133.)

---

[8] This dispute is not material though because Smith was not a decision maker.

On or about November 19, 2009, Anna M. (Mary) Valore, who was employed as a Loan Officer for Dollar Bank at its Murrysville Branch and directly reported to Wareham, informed Wareham that Ron Gavel, her subordinate, had sourced a consumer loan through a broker charging a fee, after having received a phone call from a customer complaining about a $450 fee being charged by the broker.  (McQuade Dep. at 149; Valore Dep. at 6, 46 & Ex. 1 thereto, Def.'s App. Tab G, ECF No. 33-7 at  3-4, 14; Pl.'s Dep. at 81; Gavel Dep. at 11, 13, Def.'s App. Tab H, ECF No. 33-8.)   Wareham directed Valore to get Gavel on a three-way telephone conference to discuss the matter.  (Valore Dep. at 48 & Ex. 1 thereto; Pl.'s Dep. at 90.)  During that telephone conference, Wareham, Valore and Gavel discussed the customer's complaint to Valore that a licensed mortgage broker and principal of Pennsylvania Home Equity Mortgage, Lou DeDonne, was asking the customer to pay a $450 fee.[9]  (Pl.'s Dep. at 90, 92; Valore Dep. at 48-49; LeDonne Dep. at 7, Def.'s App. Tab L, ECF No. 33-12.)   At that time, Wareham told Gavel to tell the broker not to collect a fee from the customer.  (Pl.'s Dep. at 90; Gavel Dep. at 27 & 33, Pl.'s App. Tab 7, ECF No. 39-8; Ex. 1 to Valore Dep.)  Wareham testified that he then asked Gavel and Valore if there were any other problems with this loan or any other loans, to which Gavel and Valore allegedly responded no. (Pl.'s Dep. at 90, 104.)[10]   Based on the responses of Gavel and Valore, Wareham testified that he had no reason to further investigate the matter.  (Pl.'s Dep. at 104.)

---

[9] The customer who made this complaint about the broker fee of $450 has been identified as Fabiszewski. (Valore Dep. at 49.)

[10] Gavel stated he did not recall being asked by either Wareham or Valore if there were other loans where a broker fee had been paid besides the Fabiszewski loan.  (Gavel Dep. at 31-32, 73, Def.'s Supp. App. Tab E, ECF No. 43 at 25-27.)  Valore stated she did not recall if Wareham asked Gavel if there were any other problems loans.  (Valore Dep. at 59.)  However, Valore stated that she voiced her concern to Wareham that there may be other loans that were sourced through LeDonne who charged a broker's fee.  (Valore Dep. at 59 & Ex. 1 thereto; *see also* Opinion at 9, *infra*.)

Wareham admitted that he did not inform McQuade of the issue with the Fabiszewski loan—that Gavel had sourced the loan through a paid broker—nor did Wareham investigate the extent of Gavel's sourcing of loans through paid brokers, because he claims there was no reason to investigate this issue further.  (Pl.'s Dep. at 96, 104.)  At this time, Wareham was aware that sourcing consumer loans from a mortgage broker charging a fee is against Dollar Bank's policy. (Pl.'s Dep. at 92, 103-04, 165.)

Valore recalled the three-way telephone conference and her conversation with Wareham afterwards somewhat differently.   During the three-way conference, Valore observed that Wareham questioned Gavel about the broker fee and Gavel responded that he knew nothing about what Lou DeDonne (the broker) does. (Ex. 1 to Valore Dep., Def.'s App. Tab G.)   Valore then asked Gavel about previous closing fees charged by the broker, LeDonne, and Gavel allegedly stated that he did not know what LeDonne does.   (*Id*.)   Valore then indicated to Wareham that she did not think the problem with the Fabiszewski loan was the only one. (Valore Dep. at 59.)   After the three-way conference concluded, Valore told Wareham the she did not agree with the follow-up with the broker on the Fabiszewski loan, i.e., Gavel was to call the broker and tell him not to pursue collecting a broker's fee and Gavel would call her to let her know he had talked to the broker.   (Valore Dep. at 46.)   Valore told Wareham she was not comfortable with, nor did she approve of, simply asking the broker to withdraw this one fee, as it may not resolve a possible ongoing issue of charging for referrals.   (Valore Dep. at 46, 59 & Ex. 1 thereto.)   Valore suggested that "we might be compelled to investigate [the broker's] role further[,]" to which Wareham allegedly responded that he wanted Gavel to ask the broker to "back off" of the Fabiszewskis and to contact Valore afterwards.   (Ex. 1 to Valore Dep.)

On or about November 23, 2009, Valore contacted McQuade with her concerns that Gavel may have sourced other loans to LeDonne who was charging customers a broker's fee. (Valore Dep. at 59-63; McQuade Dep. at 17-19, 149.)  McQuade asked Valore to meet with him in branch support and bring with her the names of the customers whose loans she suspected that Gavel sourced with a broker and were charged a broker's fee.  (McQuade Dep. at 20; Valore Dep. at 59-63.)

On or about November 27, 2009, Valore met with McQuade in person, she communicated to him what transpired during the three-way conference call with Wareham and Gavel, and her conversation with Wareham afterwards.  (Valore Dep. at 62.)  At her meeting with McQuade, Valore provided him with the names of eight customers whose loans were processed by Gavel and whom she suspected paid a broker's fee.  (Valore Dep. at 63; McQuade Dep. at 21, 149.)  At that time, Valore also informed McQuade that Wareham brought Alt to the Murraysville Loan Center and instructed the employees there to send their declined loans to Alt. (Valore Aff. ¶5, Def.'s App. Tab I, ECF No. 33-9; McQuade Dep. at 22-23.)  Valore testified that there were no discussions with the customers before referring the declined loans to Alt. (Valore Dep. at 40, Def.'s App. of Record Materials in Resp. to Pl.'s Counter-Stmt. of Material Facts in Dispute ("Def.'s Supp. App.") Tab D, ECF No. 43 at 23.)

Based on his discussion with Valore, McQuade conducted an investigation into these allegations.  McQuade requested that John Park, Vice President of Consumer Lending at Dollar Bank, contact the eight customers whom Valore had identified and provided to McQuade earlier. Park determined that that six of eight customer loans handled by Gavel were sourced from a broker (LeDonne) who charged a broker's fee ranging from $500 to $2,800.   In addition, McQuade spoke to Diane Bell, a senior loan representative at Dollar Bank's Virginia Manor

branch, regarding whether Wareham had told her to refer declined loans to Alt.  (Bell Aff. ¶¶ 1, 3, 6, 8, Def.'s App. Tab K, ECF No. 33-11; McQuade Dep. at 140-41.)  Bell told McQuade that she had been instructed by Wareham to refer declined loans to Alt, and she was not told to do so only if the customer asked. (Bell Aff. ¶¶ 3-4.) Bell also told McQuade that Wareham did not provide her with any instructions on how to refer declined loans to Alt, and that Wareham would get upset if he discovered that she failed to refer declined loans to Alt.  (Bell Aff. ¶¶ 5-6.)

As a result of his investigation, McQuade concluded that Wareham should be terminated and consulted with Patty Smith-Carroll, Division Head of Human Resources at Dollar Bank, to discuss his investigation and decision.  (McQuade Dep. at 12; Smith-Carroll Dep. at 23-25, Def.'s App. Tab F, ECF No. 33-6.)   Smith-Carroll concurred with McQuade's decision to terminate Wareham, but she did not participate in the decision to terminate Wareham. (Smith-Carroll Dep. at 23-25, 32-33; McQuade Dep. at 134.) On December 7, 2009, Wareham was called to a meeting with McQuade and Smith-Carroll, at which time he was asked several questions about the Gavel/broker fee situation, among other things, and McQuade informed him that he found other loans sourced by Gavel where the customers had been charged a broker's fee. (Pl.'s Dep. at 125-26; Smith-Carroll Dep. at 34-36.)[11]  McQuade then informed Wareham that he was being terminated. (Pl.'s Dep. at 126; Smith-Carroll Dep. at 34.)  Wareham asked for a verbal or written warning so that he could change whatever habits or procedures they thought to be wrong, but was told that his termination was non-negotiable. (Pl.'s Dep. at 126.) Wareham tried

---

[11] Smith-Carroll further testified that McQuade asked Wareham why he would allow Gavel to do this, to which Wareham allegedly responded that he "handled it." (Smith-Carroll Dep. at 35.) When asked how he "handled it,"  Wareham allegedly stated that he put Gavel on a written warning in HR.  (*Id.*)  However, Smith-Carroll testified that no employee is put on written warning unless the manager has come to HR, discussed it with HR, and HR approves it, and neither she nor McQuade had any knowledge of a written warning being given to Gavel. (Smith-Carroll Dep. at 35-36.)  Gavel also testified that he was not given a written warning as a result of

to question Smith-Carroll and McQuade for more specifics as to why he was being terminated but was told that the decision had been made and was non-negotiable. (*Id.*).

At the time of his termination, Wareham was 49 years old,[12] a Christian, and regularly wore a cross lapel pin to work. (Pl.'s Dep. at 171.)   McQuade, was 44 years of age at the time of Wareham's termination[13] and is also a Christian.[14]   Dollar Bank also terminated Gavel on December 7, 2009, the same date as Wareham.  (McQuade Dep. at 145; Pl.'s Dep. at 81, 165.) Gavel did not regularly wear a cross lapel pin to work.  (Valore Aff. ¶4, Def.'s App. Tab I, ECF No. 33-9.)

Thereafter, Wareham filed a timely Charge of Discrimination with the EEOC dated June 28, 2010.  (Ex. 37 to Pl.'s Dep., Tab C, ECF No. 33-3 at 60-61.)  The EEOC issued a Dismissal and Notice of Rights to Sue letter on December 15, 2010 (Compl. ¶8), and Wareham filed this timely civil action on March 4, 2011.  Discovery has been completed and Dollar Bank has now moved for summary judgment.  The motion has been fully briefed and responded to, and thus, is ripe for disposition.

## II.     LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fᴇᴅ.R.Cɪᴠ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at

---

his handling of the Fabiszewski loan.  (Gavel Dep. at 33.)
[12] Wareham's date of birth is May 8, 1960. (Pl.'s Dep. at 7, Def.'s App. tab C, ECF No. 33 – 3.)
[13] McQuade's date of birth is June 26, 1965. (McQuade Dep. at 5, Def.'s App. Tab E, ECF No. 33–5; McQuade Aff. ¶ 15, Def.'s App. TF No. 33 – 1.)
[14] McQuade Aff. ¶15, Def.'s App. Tab A, ECF No. 33-1.

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Nat'l State Bank v. Fed'l Reserve Bank of New York*, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing *Celotex,* 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963). *See also Orsatti v. New Jersey State Police,* 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing *Celotex, supra*).

Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). As to materiality, the Supreme Court explained: "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)). As to whether an issue of material is genuine, the Court held that it will genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Finally, while any evidence used to support or oppose a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* FED. R. CIV. P. 56(c)(2); *Celotex*, 477 U.S. at 324; *J.F. Feeser, Inc., v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

## III.   DISCUSSION

When direct evidence of discrimination is not available, as in the case at bar, discrimination claims are scrutinized under the familiar burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Initially, the plaintiff bears the burden of establishing a prima facie case by demonstrating:  (1) he is a member of a "protected class;" (2) he is "qualified for the position;" (3) "he was subject to an adverse employment action despite being qualified;" and (4) under circumstances that raise an inference of unlawful discrimination. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 & n. 7 (3d Cir. 2003) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993); *McDonnell Douglas,* 411 U.S. at 802; *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n. 1, 352, 356 (3d Cir. 1999)) (footnote omitted). *See also O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996). The question of whether a plaintiff has established his prima facie case is a question of law to be determined by the court. *Sarullo,* 352 F.3d at 797.  In applying the prima facie test, the court must allow the test to remain flexible and tailor it to fit the particular context of the case.  *Id.* at 797-98 (citing *Geraci v. Moody-Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir. 1996)).

If the plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Id.* at 797 (citing *McDonnell Douglas,* 411 U.S. at 802). Once the employer carries its

burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were merely a pretext for discrimination, and not the true motivation for the adverse employment action. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

### A.     Age Discrimination Claim - Plaintiff's Burden of Showing Pretext

In the case at bar, Dollar Bank concedes, for purposes of summary judgment, that Wareham has established his prima facie case of age discrimination under the ADEA  *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 10 n. 8 (ECF No. 31 at 10.)   Thus, the burden of production shifts to Dollar Bank to articulate a legitimate, non-discriminatory reason for terminating Wareham. In this regard, Dollar Bank submits that the uncontroverted evidentiary record demonstrates that it terminated Wareham's employment because:   (1) he failed to investigate claims brought to him that Gavel was sourcing consumer loans from a mortgage broker charging a fee, which was against Dollar Bank's policy, and (2) Wareham introduced Alt to loan center employees and instructed them to send declined loans to Alt, when Dollar Bank prohibited such referrals. These reasons are sufficient to satisfy Dollar Bank's burden of production at step two, and Wareham does not appear to dispute this conclusion. Thus, under *McDonnell Douglas,* the burden now shifts back to Wareham to show that the legitimate, non-discriminatory reasons articulated by Dollar Bank are a pretext for age discrimination.

Prior to the Supreme Court's decision in *Gross v. FBL Financial Services,* 557 U.S. 167 (2009),[15] a plaintiff could survive a motion for summary judgment at the third step of the burden shifting analysis, by presenting some evidence, either direct or circumstantial, from which a jury

---

[15] In *Gross*, the Supreme Court held that based on the plain language of the ADEA, which requires the plaintiff to prove that the defendant took the adverse employment action "because of [the plaintiff's] age," it would be improper to shift the burden of persuasion to the defendant in

could reasonably either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citing *Hicks,* 509 U.S. at 510-11); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)).  Following the Supreme Court's opinion in *Gross,* the court of appeals held that the *McDonnell Douglas* burden shifting framework continues to apply to age discrimination cases under the ADEA.  *Smith v. City of Allentown,* 589 F.3d 684, 691 (3d Cir. 2009).  Moreover, regardless of which prong of the *Fuentes* test plaintiff chooses to establish pretext, "the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but-for' cause for the adverse employment action." *Abels v. Dish Network Serv.,LLC,* No. 12-1291, 2012 WL 6183558, at *3 (3d Cir. Dec. 13, 2012) (citing *Gross,* 557 U.S. at 177-78; *City of Allentown,* 589 F.3d at 691). This is because plaintiff bears the ultimate burden of persuasion.  *Hicks,* 509 U.S. at 511.

That does not mean, however, that the plaintiff must come forward with *additional* evidence to show that age was the "but-for" cause of the adverse employment action, but that the evidence proffered must be sufficient for the jury to infer the ultimate fact of intentional discrimination.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146-149 (2000).  In considering whether the court of appeals had erroneously affirmed an entry of judgment as a matter of law, the Supreme Court in *Reeves* rejected the premise that a plaintiff must always introduce additional, independent evidence of discrimination. *Id.* at 149.  Relying on its prior opinion in *Hicks,* the Supreme Court went on to hold that the "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may

---

an age discrimination case.  577 U.S. at 176-77 (quoting 29 U.S.C. §623(a)(1)).

permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.  In so holding, the Supreme Court cautioned, however, that such a showing will not always be sufficient to sustain a jury's finding of discrimination, observing that there will certainly be instances where despite establishing a prima facie case and proffering sufficient evidence to disbelieve the employer's reason, no rational jury could conclude that the action was discriminatory.  *Id.*

In *Hicks,* the Supreme Court aptly explained the plaintiff's burden of persuasion under the burden shifting framework:

> The defendant's "production" (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [him]" because of his race, [*Burdine*, 450 U.S.] at 253, 101 S.Ct., at 1093. The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is required," 970 F.2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons compels judgment for the plaintiff disregards the fundamental principle of [Federal] Rule [of Evidence] 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion."

*Hicks*, 509 U.S. at 511 (other citations and footnote omitted).  In other words, "it is not enough . . . to *dis* believe the employer," but rather, "the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason[.]"   *Id.* at 511 n. 4 & 515. (emphasis in original).  Thus, "[e]ven though . . . rejection of the defendant's proffered reasons is enough at

law to *sustain* a finding of discrimination, *there must be a finding of discrimination*." *Id.* at 511 n. 4.  With these precepts in mind, the Court turns now to the *Fuentes* test.

## 1. ***Fuentes* Test**

In the case at bar, Wareham is attempting to show that Dollar Bank's reasons for terminating him are a pretext for age discrimination under the first prong of the *Fuentes* test, which focuses on whether the plaintiff has submitted evidence from which a fact-finder could reasonably disbelieve the employer's articulated legitimate reasons for terminating him. To satisfy this prong and discredit Dollar Bank's proffered reasons, Wareham:

> cannot simply show that his employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."   Rather, [Wareham] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (quoting *Ezold*, 983 F.2d at 531) (other internal quotations omitted).  In other words, Wareham must prove "not merely that [Dollar Bank]'s proffered reason was wrong, but that it was so plainly wrong that it cannot have been [Dollar Bank]'s real reason." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). Thus, in analyzing this prong, "'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge.  The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'" *Id.* (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996)).

Dollar Bank submits that Wareham cannot prove pretext under the first prong of Fuentes because he has offered no evidence to contradict or otherwise controvert Dollar Bank's

articulated reasons for terminating him. In fact, Dollar Bank argues that Wareham has corroborated its reasons for terminating him by his admission of certain facts.

### a.     Failure to Investigate Gavel

With regard to its first reason for terminating Wareham—his failure to investigate Gavel's sourcing of loans from a broker charging a fee—Dollar Bank argues that Wareham has admitted that McQuade told him, and that he knew, that Dollar Bank did not pay for referrals of consumer loans, and that a customer should not pay a referral fee for being referred to Dollar Bank for a consumer loan. Dollar Bank further submits that Wareham admits being made aware that Gavel sourced a consumer loan through a mortgage broker charging a fee, and that he did not do anything to investigate Gavel's overall practice of using paid referrals.  In addition, Dollar Bank points to Wareham's admission that he did not inform McQuade, his supervisor, about the discovery that Gavel had sourced a consumer loan from a mortgage broker charging a fee.

In response, Wareham argues that if his evidence is credited, a jury could determine that Dollar Bank's articulated reason—that he failed to investigate Gavel's use of brokers—is without credence, thus permitting an inference of unlawful age discrimination. The evidence to which Wareham refers falls into three categories, the first of which involves evidence showing he had no reason to further investigate Gavel's use of a broker charging customers a fee.  The evidence proffered by Wareham on this point consists of his testimony to the effect that: (1) he had not been made aware of any other loans for which brokers were charging Gavel's customers fees (which was against Dollar Bank's practices and policies); (2) he had no reason to believe any such loans existed; (3) no customers complained to him or other Dollar Bank employees regarding other Gavel loans; (4) he had no prior knowledge of the problem with the Fabiszewski loan or the loan itself; (5) he dealt with the Gavel problem appropriately, telling Gavel in a stern

tone that broker referred business would not be permitted, and Gavel told him that he was not transacting any more business with brokers; (6) no Dollar Bank documents reflected that Gavel had sourced several loans through brokers and the broker's fees were paid outside the closing, and (7) he had no contact with Gavel regarding these loans.  Even if this evidence is credited, the Court finds that a reasonable jury could not rationally find that based on this evidence, Dollar Bank's articulated reason is unworthy of credence.

None of the evidence proffered by Wareham discredits Dollar Bank's articulated reason because at most, this evidence shows that Wareham did not know about Gavel's use of brokers charging fees until the Fabiszewski loan was brought to his attention by Valore in November 2009.  On the other hand, the decision to terminate Wareham was based on his failure to investigate Gavel's use of a broker charging a fee **after** he discovered the problem with the Fabiszewski loan.  McQuade conducted his own investigation into Gavel's loans, but only after Valore informed him of a potential problem with other loans, and indeed, that investigation uncovered six other loans placed by Gavel with LeDonne where Dollar Bank customers were charged a broker's fee.  Moreover, at the time of his investigation, McQuade did not know why Wareham had not further investigated Gavel's loans after being informed of the Fabiszewski loan, only that Wareham failed to investigate the situation further.

Wareham also proffers that at no time did McQuade, Valore or any Dollar Bank official advise Wareham that they were investigating any other Gavel loans.  However, Wareham fails to explain, and the Court fails to see, how this evidence discredits Dollar Bank's articulated reason that he failed to investigate Gavel after being informed of the Fabiszewski loan problem.  In fact, this evidence actually lends credence to Dollar Bank's articulated reason.

In essence, Wareham's evidence proffered to show he had no reason to investigate the Gavel situation is really aimed at proving that McQuade's decision to terminate him for failure to investigate was wrong.  However, merely showing that the employer's decision was wrong is not sufficient to show that the articulated reason was implausible or unworthy of credence.  Indeed, here McQuade's investigation determined that there were six other loans where Dollar Bank customers were charged a broker's fee, in violation of Dollar Bank policy.  Thus, even if Plaintiff's evidence is given full credit, a reasonable jury could not rationally find that Dollar Bank's articulated reason of failing to investigate the Gavel loan situation after the Fabiszewski loan was brought to his attention was not the true reason for his termination.

The next category of evidence proffered by Wareham to discredit Dollar Bank's articulated reason is evidence which shows that he did not condone or encourage the payment of broker's fees by customers for loans issued by Dollar Bank.[16]  Wareham's argument appears to be in response to Dollar Bank's argument that by failing to investigate Gavel's use of a broker charging a broker's fee, he was in essence condoning or encouraging the payment of a broker's fee in violation of Dollar Bank policy.  However, both arguments miss their mark.  It cannot rationally be inferred that Wareham condoned Gavel's use of brokers charging fees where the evidence shows that he was not aware of that practice, or once aware, told Gavel to discontinue it.  On the other hand, McQuade's decision to terminate Wareham does not appear to be predicated on the inference that by failing to investigate Gavel's use of a broker charging a broker's fee, he was in essence condoning or encouraging the payment of a broker's fee in

---

[16] Specifically, Wareham points to his testimony to the effect that:  (1) no documentary evidence was presented to him at any time (either before or after he learned of the problem with the Fabiszewski loan) that Gavel was engaging in conduct considered to be in violation of Dollar Bank's normal practice regarding broker's fees; and (2) when confronted with the Fabiszewski loan problem, he definitively and decisively dealt with Gavel by sternly telling him that fees

violation of Dollar Bank policy.  Rather, Wareham's failure to investigate whether broker's fees had been paid on other loans sourced by Gavel was found by McQuade to be grounds for termination, in light of Valore's description of the three-way telephone conference on the Fabiszewski loan and additional information uncovered by McQuade's own investigation.  Both general counsel for Dollar Bank, McGhee, and the head of HR, Smith-Carroll, agreed with McQuade's conclusion.  (Smith-Carroll Dep. at 14, 23-25.)

The final category of evidence proffered by Wareham consists of evidence showing that the practice of charging a customer a broker's fee is not illegal or contrary to banking regulations.[17]   In this case, Wareham submits that all required disclosures were prepared and signed by the customers in connection with any loans that were referred to Dollar Bank by LeDonne to Gavel.  However, this evidence fails to prove pretext.  Dollar Bank's articulated reason for terminating Wareham was his failure to investigate Gavel's use of a broker charging their customers a broker's fee.  Dollar Bank did not state that it terminated him because the practice of charging a customer a broker's fee was illegal or contrary to banking regulations.  Therefore, whether or not this practice was illegal or contrary to banking regulations is simply not at issue in this case, and thus, plaintiff's evidence to this effect in no way provides any basis for a reasonable jury to rationally conclude that the articulated reason was implausible and not the true reason for his termination.

In summary, none of the above evidence proffered by Wareham would allow a reasonable jury to rationally conclude that Dollar Bank's articulated reason for terminating

---

would not be countenanced and no further business would be transacted through brokers.
[17] Although this practice may not have been illegal or contrary to banking regulations, Wareham admitted that it was contrary to Dollar Bank's practices and procedures.  (Pl.'s Dep. at 92, 103-04, 165.)

him—he failed to investigate Gavel's use of brokers after learning about the Fabiszewski loan—was implausible or untrue.

### b.        Referral Relationship with Alt

As to its second reason for terminating Wareham, Dollar Bank argues that Wareham has admitted that he (1) took his friend Alt to Dollar Bank's loan centers in Pittsburgh and Cleveland and told employees to refer declined loans to Alt, (2) did not instruct the loan center employees to only provide Alt's name to a declined customer if the declined customer asked for an alternative, and (3) did not require a written customer authorization in order for the customer to obtain assistance from Alt.  Even if it had permitted its loan centers to refer declined loans to Alt, Dollar Bank maintains that Wareham did not take any measures or implement procedures to ensure compliance with the Guidelines articulated in the federal banking regulations. To this end, Wareham acknowledged that there was no written agreement between Dollar Bank and Three Rivers Mortgage, and Alt confirmed that he was never asked by Dollar Bank to provide financial or background information about his business to Dollar Bank, even though requesting such information would have been a required action.

According to Dollar Bank, these admissions, coupled with the fact that Wareham did not provide the loan center employees with any instruction as to how to make the referral of a declined customer to Alt, created an unregulated environment for protecting the privacy of consumer information.   As such, a reasonable jury could not rationally believe that referring declined loans to Alt in violation of Dollar Bank policywas not Dollar Bank's true reason for terminating Wareham.

In opposing summary judgment, Wareham advances two arguments.  First, he submits that a significant dispute of material fact exists with regard to Dollar Bank's assertions that the

Alt referral relationship was in violation of any stated Dollar Bank policy.   In support of this argument, Wareham contends that ample evidence exists in the record to show that Alt's relationship was known to McQuade and that Dollar Bank condoned and approved the relationship.   In any event, Wareham maintains that whether McQuade's assertion that Alt's relationship with Dollar Bank was unknown to him presents a credibility issue to be determined by the jury.   Thus, the Court must examine Wareham's proffered "ample evidence."

First, Wareham points to evidence that Alt was well known to Dollar Bank employees, specifically his supervisors, Ed Brown and Jim McQuade.   With regard to Brown, Wareham proffers two memos that he wrote to Brown in 2003, which mentioned the referral relationship with Alt.   *See* Wareham Memos dated 5/14/03 and 8/8/03 (Pl.'s App. Tab 5, ECF No. 39-6 at 2-3).   However, upon close examination, the 5/14/03 memo does not say anything regarding a referral relationship, but merely states that Wareham was Alt's guest at an outing.   The 8/8/03 memo mentions that Alt invited Wareham to play in a golf outing, and notes that:

> Dave has been a terrific asset to us over the years.   He has been a conduit for us to send non Dollar Bank customers to when we can not get them financing for whatever reason.   Dave cleans up their ratios or credit and refers them back to us when they qualify as bank paper.

Wareham Memo dated 8/8/03 (Pl.'s App. Tab 5, ECF No. 39-6 at 3).   Nothing in this excerpted language suggests the nature or extent of the referral relationship that was being followed by loan center employees in referring declined loans *to Alt*.   Moreover, this memo is not material, as Ed Brown was not involved in any way in the decision to terminate Wareham.   Nor has Warham presented any evidence to suggest that McQuade was aware of this memo to Ed Brown or knew of its contents.

Next, Wareham points to evidence that Brown was aware of Alt's service, having asked Wareham to assist another senior Dollar Bank officer, Abe Nader, in obtaining a loan from Alt when he was unable to qualify for a Dollar Bank loan.  Again, the Court fails to see the relevancy of this evidence to prove that *McQuade* knew about the referral of declined loans to Alt.  This evidence shows merely that Brown was aware of Alt's services, not that Wareham had instructed all loan center employees to refer declined loans to Alt.  Also, Brown and Nader came to Wareham for a referral to Alt; this was not a situation where Dollar Bank declined a loan and a loan center employee referred that customer to Alt.  Finally, Brown was not involved in any way in the decision to terminate Wareham and, in any event, Wareham has not presented any evidence to show that McQuade knew about Wareham's referral of Nader to Alt.

Wareham also proffers evidence that McQuade was familiar with Alt through:  (1) the mutual attendance by Alt and McQuade at golf outings and branch openings; (2) regular discussions between Wareham and McQuade; (3) Wareham's memos dated 10/20/07,  11/14/07, and 1/10/08, detailing his marketing and business development efforts; (4) a chance encounter at a shopping mall; and (5) the waiver of Alt's personal banking fees by McQuade.  However, just because McQuade was familiar with Alt, that does not prove that, or create an issue of fact as to whether, *McQuade* knew about Dollar Bank loan center employees referring declined loans to Alt.

With regard to the encounters between Alt and McQuade identified above, none of this evidence provides a basis for inferring that McQuade knew that loan center employees were referring declined loans to Alt.  While McQuade was present at various branch openings when Alt was also there, Alt did not have a specific one-on-one conversation with McQuade about Dollar Bank referring declined loans to him.  (Alt Dep. at 54.)  McQuade was around the group

of people attending branch openings when Wareham introduced Alt to everyone as the person who "gets the Dollar Bank turndowns and refers them back to us." (*Id.*)   However, McQuade testified he was familiar with Alt as one of many different referral sources that Wareham would mention from time to time.  (McQuade Dep. at 81.)  In any event, Wareham has not provided any evidence that shows his introduction of Alt at branch openings included any mention of how Alt was receiving the "turndowns."   In addition, a brief, chance encounter between McQuade and Alt at a shopping mall where they generally inquired about each other's family shows merely that they were casual acquaintances, nothing more.   Similarly, a reasonable jury could not rationally infer that McQuade knew Alt on a more personal level simply from McQuade's waiving of Alt's personal banking account fees.   Dollar Bank regularly waives fees for its customers when asked and/or warranted; this was not unique to Alt.

Next, Wareham points to evidence that he disclosed to McQuade both verbally and in memos that he was taking Alt to the loan centers in Pittsburgh and Cleveland, and that McQuade knew that Alt was part of the way Dollar Bank did business.  (Pl.'s Dep. at 106.)  However, Wareham has not pointed to any discussions with McQuade where Wareham specifically made McQuade aware that loan center employees were referring declined loans *to Alt*.  Likewise, the memos dated 4/30/07, 10/20/07, 11/14/07, 12/17/07 and 1/10/08 from Wareham to McQuade show that Alt was a consistent source of referral business *to Dollar Bank*.  The Court notes that Wareham's memo dated 1/10/08 does state:  "Dave [Alt] is possible our most consistent source of referral business.  He is able to get deals done that we can not.  He cleans them up and sends them back[,]" but even that too falls short of proving McQuade had notice of the specific referral relationship engaged in by loan center employees at the direction of Wareham, over which he was terminated.   At best, this memo shows that McQuade knew that Alt was one of many

sources of referrals to Dollar Bank, nothing more.   (McQuade Dep. at 81.)   Wareham acknowledges as much at the meeting with McQuade and Smith-Carroll on December 7, 2009 when he was informed he was being terminated.[18]

Thus, as Wareham has failed to come forward with evidence to show that or raise an issue of fact as to whether McQuade knew that loan center employees were referring declined loans to Alt, McQuade could not have approved or condoned a referral practice of which he had no knowledge.   Similarly, because there is no evidence to show that McQuade knew that loan center employees were referring declined loans to Alt, the fact that McQuade never told Wareham that he could not refer declined loans to Alt or that such referrals were improper does not prove that McQuade condoned or approved such referrals.

Along the same line, Wareham points to the fact that neither Brown nor McQuade ever questioned what his memos meant and, consequently, a jury could certainly conclude by reading the memos and saying nothing, Brown and McQuade assented to approving the deferral of declined loans to Alt by loan center employees.   However, as explained above, the memos are innocuous and thus there is no reason for Brown or McQuade to have questioned them.   Thus, a reasonable jury could not rationally find that merely by reading the memos and saying nothing McQuade condoned and approved the loan center employees' practice of deferring declined loans to Alt.

Finally, Wareham proffers evidence which he contends shows that knowledge of Alt's services extended beyond McQuade to senior executives who served as members of the LCC. Wareham stated in his self-serving affidavit that he told the LCC about his referral relationship

---

[18] Smith-Carroll testified at her deposition that at Wareham's termination meeting, McQuade told Wareham he did not give him permission to refer declined loans and hand off customer information to Alt, and asked him who gave him permission to do so, and Wareham replied "Ed

with Alt in his monthly reports and discussions with the LCC.  (Pl.'s Aff. ¶11, Pl.'s App. Tab 9.)
However, Wareham's evidence fails to show what specifically the LCC was told about the
referral relationship with Alt, and Smith testified it was not discussed in the LCC.  (Smith Dep.
at 23.) As the other memos show, the mention of Alt was innocuous and lacking in specifics, and
most of the references to Alt mentioned that he was a good source of referrals *to Dollar Bank*,
not the other way around.  Thus, Wareham's evidence regarding the LCC does not show that the
LCC, or McQuade in particular,[19] knew about referrals of declined loans *to Alt*.  In any event, the
LCC did not have any supervisory or decision-making authority over Wareham.  Therefore, this
evidence does not create a triable issue of fact as to whether McQuade knew about the referral of
declined loans to Alt.

       Wareham's second argument in opposing summary judge is that credibility issues exists
as to his directions to loan center employees with regard to using (or failing to use) Alt's services
for declined  loans.  Wareham disputes that the referral practice followed by the loan center
employees at his direction violated any privacy rules or Dollar Bank policy.  Wareham's
evidence consists of statements from Betty Lodovico, Ron Gavel, and himself as to when a
customer whose loan had been declined would be referred to Alt.  Wareham contends that his
evidence is contrary to the Dollar Bank's evidence consisting of statements from Valore and
Diane Bell to McQuade.  However, this dispute is not material as to whether DB's proffered
reason was a pretext for age discrimination.

       The uncontroverted evidence shows that  McQuade believed that the referral practice
followed by the loan center employees—verbal authorization only, without any written

---

Brown."  (Smith-Carroll Dep. at 36.)
[19] Although McQuade was a member of the LCC, he did not regularly attend LCC meetings.
(Smith Dep. at 11.)

28

agreement in place between Alt and Dollar Bank, with no background check and no instructions given to employees on procedure to be followed—was a violation of Dollar Bank policy and privacy rules, and Wareham's referral method was just not sound business practice. *See* McQuade Aff. ¶¶11-14; Park Aff. ¶9; Smith Dep. at 23.[20] Even if McQuade was wrong in concluding that Wareham's referral practice violated privacy rules and/or Dollar Bank policy, the critical inquiry here is not whether Wareham actually violated privacy rules or Dollar Bank policy, but rather, whether McQuade's belief that Wareham had violated DB policy or privacy rules was so unreasonable or unworthy of credence that a reasonable jury could find that it was so plainly wrong that it was not the true reason for terminating Wareham.  That inquiry must be guided by the particular information discovered by McQuade, or otherwise known or available to him in November and early December of 2009. The evidence of record here shows that through his investigation, McQuade discovered that the loan center employees were not given any instructions by Wareham, nor had he implemented any procedures, on how to make the referrals to Alt.  Moreover, the referrals were based only on verbal authorizations by the customers. Wareham admittedly does not dispute these facts.

The employees interviewed by McQuade in November 2009 (Valore and Diane Bell) stated that they had been told by Wareham to refer declined loans to Alt, and not only if the customer asked.  (Valore Dep. at 40; Bell Aff. ¶¶ 3-4.)  Moreover, Valore testified that on one occasion, Alt gave her a gift card for referring a declined loan to him, which is against Dollar

---

[20] According to McQuade, if Dollar Bank actually allowed such a referral relationship, certain procedural safeguards would have been implemented to protect customer privacy, such as obtaining written consent from customers to share his/her information with a non-affiliated third party; implementing a script for loan center employees to follow in referring declined loans; conducting a background check and checking references of the non-affiliated third party; and entering into a written agreement with the non-affiliated third party.  (McQuade Aff. ¶¶11-12.)

Bank policy.  Diane Bell stated that she was verbally reprimanded by Wareham for failing to refer loans to Alt.  While Wareham may disagree with the content of these statements, he does not deny that these statements were made to McQuade when he was investigating Wareham's conduct in November of 2009.

Plaintiff cannot now try to create an issue of fact as to Dollar Bank's articulated reason by pointing to evidence (testimony from Lodovico, Alt and Gavel) to contradict Valore's and Bell's statements regarding referral of declined loans.[21]  That evidence would only be relevant if the issue to be determined here was whether McQuade was mistaken in concluding that Wareham violated Dollar Bank policy or privacy rules.  More importantly,  it does not appear that McQuade possessed any evidence which would have contradicted Valore's and Bell's statements at the time he made his decision to terminate Wareham.[22]  In addition, as this Court found above, based on the record evidence here a reasonable jury could not rationally find that McQuade knew about the Wareham's referral arrangement with Alt prior to his conversation with Valore in November 2009.

---

[21] Some employees indicated that they were instructed by Plaintiff to refer the declined loans to Alt only if the customer initiated the request; other employees stated that they were instructed to ask the customer whose loan had been declined if they wanted an alternative, and if they responded positively, to refer them to Alt.  In either situation, verbal authorization from the customer to release their information to Alt was all that was required.

[22] Wareham has not argued or presented any evidence to show that McQuade possessed that information at the time he made the decision to terminate him.  Indeed,  it appears that a further investigation was conducted by Scott Terpenning in Branch Support at Dollar Bank in June of 2011 (after this lawsuit was filed), wherein Terpenning questioned various employees at the loan centers as to whether they had been asked by Wareham to refer declined loans to Dave Alt, and whether or not they were ever reprimanded for NOT sending business to Alt.  (Ex. 23 to Pl.'s Dep., Def.s App. Tab C, ECF No. 33-3 at 58.)  According to Terpenning's report to McQuade dated 6/20/11, all of the loan center employees questioned indicated that Wareham told them to refer declined loans to Alt, but only one employee, Diane Bell reported that she had been verbally reprimanded for not doing so.  (*Id.*)

Accordingly, the Court finds that Wareham has failed to present evidence of pretext under the first prong of *Fuentes* from which a "'reasonable factfinder could rationally find [Dollar Bank's proffered reasons] unworthy of credence,' and hence infer 'that [Dollar Bank] did not act for [the asserted] nondiscriminatory reasons." *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531).

## 2.    Age as the "But For" Reason for Termination

Dollar Bank further argues that Wareham has failed to set forth sufficient evidence from which a reasonable jury could find that age was the "but for" reason for his termination. According to Dollar Bank, any argument that McQuade was motivated by Wareham's age in deciding to terminate his employment is completely meritless as a matter of law for several reasons.  First, Dollar Bank maintains that McQuade made the decision to retain Wareham since late in 2003, despite the fact that Wareham was 43 to 49 years of age during the period from 2003 to 2009.  Moreover, since 2006, McQuade consistently rated Wareham's performance as exceeds expectations and recommended him for a promotion to Vice President Loan Centers effective January 2007.  Dollar Bank submits that it is illogical to conclude that McQuade, who praised and promoted Wareham at the ages of 43 through 48, would choose to terminate his employment when he was 49 because of his age, especially where the termination occurred quickly after discovery of the Gavel and Alt situations.

Next, Dollar Bank contends that McQuade's age—44—at the time he terminated Wareham further weakens any possible claim that Wareham's age was a factor in his termination.  Dollar Bank relies on *Elwell v. Pennsylvania Power & Light, Inc.,* 47 F. App'x 183, 188-89 (3d Cir. 2002), and *Ziegler v. Delaware County Daily Times,* 128 F. Supp. 2d 790, 811-

12 n. 47 (E.D.Pa. 2001), for the proposition that any inference of discrimination is weakened in an age discrimination case where the decision maker is in the same protected class as the plaintiff, or is not significantly younger than the plaintiff.  At the time of his termination, Wareham was 49 years old, only 5 years older than McQuade, and Small-Carroll, the head of Human Resources who concurred in the decision to terminate Wareham, was 67 years old.

Third, Dollar Bank emphasizes that McQuade was not even the source of the information leading to Wareham's termination, but rather, Valore brought the Gavel and Alt situations to McQuade's attention shortly after her three-way telephone conference with Wareham and Gavel in November of 2009, based on her concerns with Wareham's handling of the situation.

Finally, given the lack of any evidence suggesting that the timing of the November events is mere coincidence, and Wareham's own testimony that McQuade treated him no differently than any other employees, Dollar Bank posits that Wareham's age discrimination claim is nothing more than an attempt to second guess Dollar Bank's business decision in this matter; however, an employee's subjective disagreement with an employer's business judgment is insufficient to establish discrimination, citing *Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir. 1991), and *Fuentes,* 32 F.3d at 765.

For all of these reasons, Dollar Bank maintains that a reasonable jury could not conclude that age was a "but for" factor in its decision to terminate Wareham.  The Court agrees.  In addition to the reasons identified by Dollar Bank, the Court finds that other factors further buttress the conclusion that a reasonable jury could not rationally conclude that age was the "but for" cause of Wareham's termination.  First, Wareham admitted in his deposition that he was terminated based on factors other than his age or religion.  Wareham stated that he believed he was terminated because he had complained that several female employees were denied

opportunities and promotions that they deserved and because "McQuade wanted full credit for my successes and control of my divisional resources." (Pl.'s Dep. at 163, 166.) Second, the record does not contain any evidence of hostility towards older workers or ageist comments. Third, Wareham admits that McQuade treated him no differently than other employees. (Pl.'s Dep. at 60.)

Wareham argues that because he has established numerous inconsistencies, weaknesses, and improbabilities in Dollar Bank's articulated reasons for terminating him, he satisfied the first prong of the *Fuentes* test, and thus, he need not also come forward with additional evidence of discrimination beyond the prima facie case. While Wareham correctly states that a plaintiff who has proffered sufficient evidence for a jury to disbelieve the employer's articulated reasons need not produce *additional* evidence of discrimination beyond his prima facie case, *Reeves,* 530 U.S. at 148, he fails to acknowledge that evidence proffered to discredit the employer's reasons must also "allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but-for' cause for the adverse employment action[,]" *Abels*, 2012 WL 6183558, at *3; (citing *Gross*, 557 U.S. at 177-78; *City of Allentown,* 589 F.3d at 691). Here, Wareham's evidence fails to establish either that Dollar Bank's articulated reasons were false or that age discrimination was the real reason for his termination. Without the benefit of an inference of discrimination from discrediting the employer's articulated reasons, Wareham's prima facie case and other evidence in the record are insufficient to allow a reasonable jury to rationally infer the ultimate fact of intentional discrimination.

Accordingly, for the reasons set forth above, the Court concludes that a reasonable jury could not rationally find, based on the totality of evidence here, that Wareham has carried his ultimate burden of persuasion to show that age was the "but-for" cause of his termination. As

such, Dollar Bank is entitled to summary judgment on Wareham's age discrimination claim under the ADEA.

## B.     Plaintiff's Prima Facie Case of Religion-Based Discrimination

Dollar Bank has also moved for summary judgment on Wareham's claim of religious discrimination.  In support of its motion, Dollar Bank argues that his religious discrimination claim fails as a matter of law for two reasons:  (1) Wareham cannot establish a prima facie case of failure to accommodate religious expression; and (2) Wareham cannot establish a prima facie case of religious discrimination based on disparate treatment.  The Court will address each of these arguments in turn.

### 1.     Failure to Accommodate Religious Beliefs/Practices

Under Title VII, employers are required to make reasonable accommodations for the religious beliefs and practices of their employees, unless doing so would result in "undue hardship" to the employer.  42 U.S.C. §§2000e-2(a)(1), 2000e(j) (1982).  In order to establish a prima facie case of discrimination based on failure to accommodate religious beliefs or practices, a plaintiff must demonstrate three things:  (1) he "holds a sincere religious belief that conflicts with a job requirement;" (2) he "informed h[is] employer of the conflict;" and (3) he was "disciplined for failing to comply with the conflicting [employment] requirement." *Shelton v. Univ. of Med. & Dentistry of N.J.,* 223 F.3d 220, 224 (3d Cir. 2000) (citing *Protos v. Volkswagen of Am., Inc.,* 797 F.2d 129, 133-34 (3d Cir. 1986)); *Schwartzberg v. Mellon Bank, N.A.,* No. 02:06-cv-1006, 2008 WL 111984, *8 (W.D.Pa. Jan. 8, 2008) (citing *Shelton, supra*), *aff'd* 307 F. App'x 676 (3d Cir. 2009).  Once plaintiff has established a prima facie case, the burden then shifts to the employer to show either that "it made good faith efforts to accommodate, or that the requested accommodation would work an undue hardship." *Shelton.* 223 F.3d at 224 (citing

*United States v. Bd. of Educ. for Sch. Dist. of Phila.,* 911 F.2d 882, 886-87 (3d Cir. 1990); *Getz v. Commw. of Pa., Dep't of Public Welfare,* 802 F.2d 72, 73 (3d Cir. 1986)); *see also Schwartzberg,* 2008 WL 111984, at *8 (citing *Getz, supra*).  "Any reasonable accommodation is sufficient to meet an employer's obligation under Title VII, as long as it 'eliminates the conflict between employment requirements and religious practices.'"  *Schwartzberg,* 2008 WL 111984, at *8 (quoting *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68-70 (1986)).  If the employer satisfies its relatively low burden, then the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the employer's articulated reasons were a pretext for discrimination. *Id.* (citing *Ezold,* 983 F.2d at 522).

Dollar Bank submits that Wareham has failed to establish a prima facie case for two reasons:  (1) His claim is time-barred; and (2) he cannot show that he was adversely affected because he was allowed to continue wearing a cross lapel pin despite alleged remarks by Smith that he should not wear the cross lapel pin.  The Court finds that Dollar Bank's first argument has merit and is dispositive of the failure to accommodate claim.

Dollar Bank correctly states that in order to bring suit in federal court for religious discrimination under Title VII, the plaintiff must file a charge of discrimination with the E.E.O.C. within 300 days of the alleged act of discrimination.  *Brennan v. Nat'l Tel. Directory Corp.,* 881 F. Supp. 986, 993 (E.D.Pa. 1995) (citing 42 U.S.C. § 2000e-5(e)(1)).  If the charge of discrimination with the E.E.O.C. is not timely filed, Dollar Bank submits that the plaintiff will be barred from recovering the judicial remedies provided under Title VII, citing  *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109-10 (2002).   In the case at bar, Dollar Bank notes that Wareham's charge of discrimination filed with the E.E.O.C. is dated June 28, 2010, and therefore, in order for the failure to accommodate claim to be timely, at least one of the

occasions where Smith allegedly criticized Wareham for wearing a cross lapel pin must have occurred after September 1, 2009.   Dollar Bank submits that the most recent occasion where Smith told Wareham not to wear the cross lapel pin occurred on January 15, 2008.  As such, the charge of discrimination was filed significantly more than 300 days after January 15, 2008, and therefore, Wareham's failure to accommodate claim is untimely.  Thus, Dollar Bank maintains that Wareham should be precluded from pursing his failure to accommodate claim in this civil action.

In response, Wareham counters that Smith's conduct occurred at least six times through the time of his termination, and therefore, he alleges a continuous course of conduct, rather than a discrete act of religious discrimination as suggested by Dollar Bank.   In support, Wareham cites to his affidavit,[23] where he states: "Joseph Smith criticized me on at least 6 occasions for wearing my cross lapel pin instead of the Dollar Bank lapel pin," Pl.'s Aff. ¶18 (Pl.'s App. Tab 9), and *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481-82 (3d Cir. 1997).   Wareham's argument misses the mark for two reasons.  First, the continuing violation doctrine has been applied to hostile work environment claims, but not to claims for discrete acts of discrimination. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002).  Wareham is not pursing a religious-based hostile work environment claim, nor has he cited any authority for applying the continuous violation doctrine to his failure to accommodate claim.   Indeed, authority exists

---

[23] Dollar Bank argues that the sham affidavit doctrine precludes Wareham from relying on his affidavit as evidence. The sham affidavit doctrine, which has been recognized in this circuit, allows a district court to disregard an offsetting affidavit submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony without explaining the contradiction.  *In re CitX Corp., Inc.,* 448 F.3d 672, 679 (3d Cir. 2006) (citing *Baer v. Chase,* 392 F.3d 609, 623-24 (3d Cir. 2004)).  The Court declines Dollar Bank's invitation to disregard Wareham's affidavit based on this doctrine, as Dollar Bank has not explained what, if any, inconsistencies or contradictions exist between Plaintiff's affidavit and his deposition testimony.

which holds to the contrary. *See Pisarz v. PPL Corp.,* Civ. A. No. 4:10-CV-01432, 2010 WL 4942536, *3 (M.D.Pa. Nov. 30, 2010) (defendant's failure to accommodate disabled plaintiff's request for special chair was discrete act of discrimination) (citing *Tobin v. Liberty Mutual Ins. Co.*, 553 F.3d 121, 129 (1st Cir.2009) ("holding that when an employee's request for accommodation is refused, 'the refusal is a discrete discriminatory act triggering the statutory limitations period'"); *Zankel v. Temple Univ.*, 245 F. App'x 196, 197 (3d Cir.2007) ("affirming the district court's dismissal of the plaintiff's complaint where plaintiff filed her EEOC complaint more than three hundred days after she made her final request for accommodation"). Thus, it is clear that each of the occasions where Smith allegedly criticized Wareham constitutes a separate and discrete act of discrimination.  As such, the continuing violation doctrine does not apply to his failure to accommodate claim.

The Supreme Court in *Morgan* held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period[,]" "even when they are related to acts alleged in timely filed charges." *Id.* at 105, 113.  The Court reasoned that discrete acts, such as "termination, failure to promote, denial of transfer, or refusal to hire," are easy to identify, and each constitutes a separate actionable "unlawful employment practice," provided it occurs within the 300-day time period.  *Id.* at 114.  *See also O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir. 2006) (for purposes of Title VII, "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation" are discrete acts for which the limitations period begins to run from the date of the act). Accordingly, the Supreme Court held that the continuing violation theory does not apply to save otherwise untimely discrete unlawful employment actions.  536 U.S. at 114.

Second, Wareham cannot show that at least one of the instances where Smith allegedly criticism him occurred within the 300 day time period.[24]  The evidence submitted by Wareham shows that Smith criticized him on 6 occasions for wearing a cross lapel pin instead of the DB lapel pin, but he fails to provide any dates for these alleged occurrences. In his deposition testimony regarding this issue, Wareham testified that Smith began criticizing his wearing of the cross lapel pin beginning in 2006-2007.  In his Complaint, Wareham alleges that beginning in approximately 2006, Smith told him he objected to his wearing the cross lapel pin.  (Compl. ¶17.)  Wareham also cited the testimony of Smith, who estimates that he had the discussion with Wareham five or six times.  In addition to Wareham's evidence, Dollar Bank points to Smith's testimony that the most recent occasion where he recalls criticizing Wareham for wearing the cross lapel pin was a dinner meeting on January 15, 2008.  In paragraph 48 of his Counter Statement of Material Facts (ECF No. 39), Wareham alleges that over a two year period beginning in 2007 and ending with his termination, Smith criticized him on at least six occasions for wearing the cross lapel pin.  However, the cited evidence in support of CSMF ¶48 does not support his statement that the criticism continued until his termination.[25]  Therefore, none of this evidence establishes that at least one of the times Smith allegedly told Wareham not to wear his cross lapel pin occurred within the 300 day period, i.e., after September 1, 2009. Plaintiff's ambiguous statements do not suffice to meet his burden of proof at the summary judgment stage.

---

[24] Wareham does not address this issue but instead focuses on the test in *Rush* for establishing a persistent, ongoing pattern of discrimination for application of the continuing violation doctrine, which this Court found does not apply here.

[25] Wareham cites to his affidavit ¶16, which is not on point.  It appears he meant to cite to ¶18, which states only that Smith criticized him on 6 occasions.

Accordingly, the Court finds that Wareham's claim for failure to accommodate religious beliefs/practices is untimely.  Therefore, the Court will grant Dollar Bank's motion for summary judgment on this claim.[26]

## 2.    Religious Discrimination Based on Disparate Treatment

Next, Dollar Bank argues that Wareham cannot establish that his termination was due to his Christian religion.  Dollar Bank's argument is premised on the assumption that Wareham is attempting to prove his disparate treatment claim with indirect or circumstantial evidence, and thus, utilizes the *McDonnell Douglas* burden shifting framework to evaluate his disparate treatment claim.  Under that framework, Dollar Bank submits that Wareham has failed to prove a prima facie case of disparate treatment because he cannot prove that Dollar Bank treated him differently than it treated individuals with other religious beliefs or affiliations. In response, Wareham counters that the hostility visited upon him by Smith and McQuade constitutes direct evidence of discrimination, making the *McDonnell Douglas* burden shifting framework inapplicable.

As a preliminary matter, the Court notes that Wareham has not asserted in his Complaint a claim for religious discrimination *based on disparate treatment*.  Query then why Dollar Bank has moved for summary judgment on a non-pled claim?  However, because the parties have briefed the issue, the Court will consider Dollar Bank's argument.

An individual can pursue a disparate treatment claim under Title VII in two ways.  First, where no direct evidence of discrimination exists, the plaintiff can prove his case through the *McDonnell Douglas* burden-shifting framework.  Second, where the plaintiff proceeds to prove

---

[26] Because the Court finds that the failure to accommodate claim is untimely, it need not reach Dollar Bank's other argument that he was not adversely affected by his continuing to wear the cross lapel pin.

his case of discrimination through direct evidence, the *McDonnell Douglas* framework does not apply. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002). However, in proving discrimination through direct evidence, a plaintiff faces a "high hurdle." *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 976 (3d Cir. 1998) (citation omitted). "Direct evidence of discrimination is evidence that is so revealing of a discriminatory animus that it is not necessary for the plaintiff to rely on a presumption from his or her prima facie case to shift the burden of production to the defendant." *Prise v. Alderwoods Group, Inc.,* 657 F. Supp. 2d 564, 587 (W.D.Pa. 2009) (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097-98 (3d Cir.1995)). "Where direct evidence of discrimination exists, there is no need for an inference of discrimination to be drawn, since the discrimination itself is readily transparent." *Id.* (citing *Starceski, supra*).

One form of direct evidence is "'statements of a person involved in the decision-making process that reflect a discriminatory or retaliatory animus of the type complained of in the suit,' even if the statements are not made at the same time as the adverse employment decision, and thus constitute only circumstantial evidence that an impermissible motive substantially motivated the decision." *Fakete v. Aetna, Inc.,* 308 F.3d 335, 339 (3d Cir. 2002) (citations omitted). On the other hand, the court of appeals noted that the courts have agreed that "statements by non-decisionmakers, statements by decisionmakers unrelated to the contested employment decision, and other 'stray remarks'" do not constitute direct evidence. *Id.* at 338 n. 2 (citatons omitted). The court of appeals in this circuit has repeatedly looked to Justice O'Connors' concurrence in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989)*,* for guidance as to the type of evidence required to establish direct evidence of discrimination. *Fakete,* 308 F.3d at 338 n. 2 (citation omitted); *Starceski,* 54 F.3d at 1096. In this regard, Justice O'Connor instructed:

> [S]tray remarks in the workplace, while perhaps probative of [a
> discriminatory animus], cannot justify requiring the employer to
> prove that its [employment] decisions were based on legitimate
> criteria. Nor can statements by nondecisionmakers, or statements
> by decisionmakers unrelated to the decisional process itself, suffice
> to satisfy the plaintiff's burden in this regard.

*Price Waterhouse*, 490 U.S. at 277 (internal citation omitted).[27]   Finally, the proffered direct

evidence of discrimination must have some causal connection to the decision to terminate the

plaintiff.  *Sarullo,* 352 F.3d at 798; *Ziegler,* 128 F.Supp. 2d at 803.   The Court turns now to

Wareham's proffered direct evidence of discrimination.

Wareham points to McQuade's expressed hostility toward his religious beliefs, as well as

a corporate culture of religious hostility expressed by Smith.   Wareham further contends that

Smith's remarks should not be considered  "stray remarks" of a non-decisonmaker because he

was in a position of authority over Wareham, and as a member of the LCC, exercised substantial

control over his budgets and his overall operation of the loan center.   At a minimum, Wareham

contends that Smith's continuing criticism of Wareham's expressions of religious belief is

circumstantial evidence of a corporate culture of religious hostility existing at Dollar Bank, and

may be considered as proof of intentional discrimination.   In support, Wareham cites several

cases for the proposition that discriminatory remarks by non-decisionmaker corporate executives

were probative of intentional discrimination and thus allowed into evidence. *See, e.g., Ryder v.*

---

[27] Congress amended Title VII in 1991 to set forth standards applicable to mixed-motive cases
under Title VII, partly in response to the Supreme Court's decision in *Price Waterhouse.  Brown
v. Kaz,* 581 F.3d 175, 182 n. 5 (3d Cir. 2009).   Since the amendments to Title VII, the court of
appeals and district courts in this circuit have continued  to apply Justice O'Connor's standard as
to what constitutes direct evidence of discrimination in cases brought under the ADEA and
Section 1981. *Fakete,* 308 F.3d at 338 n. 2 (ADEA); *Brown,* 581 F.3d at 182 (§1981); *Ziegler v.
Delaware Cnty. Daily Times,* 128 F.Supp.2d 790, 802 (E.D.Pa. 2001) (ADEA).   As it appears
that the 1991 amendment to Title VII do not address what constitutes direct evidence of
discrimination, but only the parties' burdens of proof, this Court views Justice O'Connor's
concurrence in *Price Waterhouse* regarding the types of evidence which do not constitute direct
evidence—stray remarks—as still good law.

*Westinghouse Elec. Corp.,* 128 F.3d 128 (3d Cir. 1997); *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 54 (3d Cir. 1989); *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 333 (3d Cir. 1995). Based on this authority, Wareham submits that Smith's open hostility to his religion is probative of the overall culture of religious hostility at Dollar Bank. Thus, affording him all reasonable inferences from the evidence as required at summary judgment, Wareham submits that he has produced sufficient evidence from which a reasonable jury could infer that his discharge was motivated by unlawful religious discrimination.

As to Wareham's argument that McQuade's expressed hostility toward his religious beliefs constitutes direct evidence of religious discrimination, the Court finds that Wareham has failed to present sufficient evidence from which a reasonable jury could find that McQuade harbored a discriminatory animus towards him based on his religious beliefs, and that it was a motivating factor in his decision to terminate Wareham. Wareham admits that McQuade never asked him to stop wearing his cross lapel pin. In addition, while Wareham openly expressed his religious beliefs to McQuade on a number of occasions, Wareham recalled only one situation where McQuade allegedly responded to Wareham that he would not know about whether Wareham worked for the Lord because he (McQuade) is a heathen. (McQuade Dep. at 109-110; Pl.'s Aff. at ¶22, Pl.'s App. Tab 9.)[28]

Plaintiff also proffers evidence that McQuade was verbally abusive toward him and regularly used profane language to which Wareham strenuously objected, and to which McQuade responded by telling him that "he would talk to [him] any 'God damn' way that he wanted to." (Wareham Decl. ¶¶ 21-24, Pl.'s App. Tab 9, ECF No. 39-10.) The Court finds as a

---

[28] Wareham also stated in his affidavit that "McQuade criticized his faith" but he does not provide any details as to the nature of the alleged criticism or when such criticism(s) were allegedly made by McQuade. (Pl.'s Aff. ¶22.) This self-serving statement is insufficient to raise

matter of law, however, that the use of profanity does not rise to the level of religious hostility. *Goerg v. Allegheny Energy Serv. Corp.,* Civ. A.  No. 10-1387, 2012 WL 1235017, *5 (W.D.Pa. Apr. 11, 2012) (employer's comment, "Jesus Christ, I didn't know," could not reasonably be considered intentional discrimination against plaintiffs because of their religious affiliations). Moreover, Wareham admitted that McQuade treated everyone that way, not just him.

Wareham also offers as evidence his request for a transfer because of McQuade's hostility and treatment of him, which was denied. *See* Pl.'s CSMF ¶52 (ECF  No. 39.)  However, the evidence does not support Wareham's statement that he requested the transfer because of McQuade's "hostility."   *See* Pl.'s Aff. ¶25 (Pl.'s App. Tab 9); Pl.'s Dep. at 63.  Moreover, Smith-Carroll in Human Resources recalled that she spoke with Wareham in 2004 when he requested a transfer, due to him being upset over not receiving a salary increase with his 2004 performance evaluation.  (Smith-Carroll Dep. at 47-48.)

Turning to Wareham's second argument, the Court finds Smith's remarks allegedly criticizing Wareham's wearing of a cross lapel pin constitute nothing more than stray remarks by a non-decision maker, and therefore, cannot be considered direct evidence that Wareham's Christian religion was a motivating factor in McQuade's decision to terminate him.  Contrary to Wareham's assertions, the undisputed evidence here shows that Smith was not a decision-maker—he had no authority over Wareham, nor was Smith involved in the decision to terminate him.

As to Wareham's argument that Smith's continuing criticisms of his expressions of religious beliefs constitute circumstantial evidence of a corporate culture of religious hostility, that argument fails on several fronts.  First, it ignores the fact that McQuade is undisputedly the

a genuine issue of material fact.

person at Dollar Bank who made the decision to terminate Wareham.  Second, Wareham's argument conflates his evidentiary burden under the *McDonnell Douglas* burden shifting framework with the direct evidence approach which he claims to be proceeding under here. Third, even if Wareham was proceeding under a burden shifting analysis, he has not shown that either Smith or McQuade were higher level executives, from which a jury could infer that their views were probative of a bank-wide managerial policy or culture of religious hostility.  By contrast, in the cases cited by Wareham, the remarks were made by the CEOs of the various companies and thus were found to provide *circumstantial* evidence of a corporate culture of discrimination.  Also, in those cases, the respective plaintiffs were attempting to prove their cases under the burden shifting framework of *McDonnell Douglas,* unlike Wareham who has taken the direct evidence approach.  For these reasons, the cases cited by Wareham are distinguishable, and thus, inapposite to the case at bar.

Admittedly, Wareham believed he was terminated because he voiced complaints that certain female employees were given the same opportunities and promotions and because McQuade wanted to take over his divisional business.  In light of Wareham's own admission and all of the evidence of record, the Court finds that Wareham has failed to proffer sufficient evidence from which a reasonable jury could find that his religion was a motivating factor in McQuade's decision to terminate him.  Accordingly, the Court will grant Dollar Bank's motion for summary judgment as to Wareham's claim for religious discrimination based on disparate treatment.[29]

---

[29] Wareham has failed to identify any comparators who were not members of the Christian faith and who were treated more favorably than he.  This is a prerequisite to proving a disparate treatment claim.

IV.    **<u>CONCLUSION</u>**

For the reasons set forth above, the Court finds that no genuine issues of material fact exist, and that Dollar Bank is entitled to judgment as a matter of law as to both the age discrimination claim under the ADEA and the religious based discrimination claim under Title VII.  Therefore, the Court will grant Dollar Bank's Motion for Summary Judgment in its entirety.

An appropriate order will follow.

Dated:  March 29, 2013                          By the Court:


 s/Lisa Pupo Lenihan          
LISA PUPO LENIHAN
Chief United States Magistrate Judge

cc:     All Counsel of Record
        *Via Electronic Mail*